UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
MERVAT SOLIMAN and MOHAMMED
SOLIMAN,

                        Plaintiffs,

             -against-

THE CITY OF NEW YORK and THE CITY
OF NEW YORK POLICE DEPARTMENT,
POLICE OFFICER JARED OCK and NEW
YORK CITY POLICE OFFICERS "John Does
1-10,"

                        Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**

15-CV-5310 (PKC) (RER)

PAMELA K. CHEN, United States District Judge:

       Plaintiffs Mervat and Mohammed Soliman filed this action pursuant to 42 U.S.C. § 1983

and New York common law seeking damages and injunctive relief based on their arrests and

prosecutions, and Mervat's post-arrest detention, all arising from an altercation with their

neighbors in January 2015.  Plaintiffs allege that Defendant Jared Ock, a New York City Police

Department ("NYPD") officer, violated their civil rights by arresting them and initiating a criminal

prosecution against them without probable cause.  Mervat further alleges that her rights were

violated when she was subjected to excessive force and other mistreatment during her post-arrest

detention.  Finally, Mervat asserts that her rights under the New York and U.S. Constitutions to

freely exercise her religion were violated when her Hijab was removed on the scene of the arrest,

and NYPD officers required her to remove her Hijab during post-arrest booking.

       Defendants have not filed an answer to Plaintiffs' complaint, and no discovery has been

taken in this case.  In lieu of filing a proposed case management plan, the parties submitted a joint

letter requesting that any initial pre-trial conference be held in abeyance until after briefing concluded on a motion by Defendants to dismiss the complaint and for summary judgment. (Dkt. 11.) The parties requested this postponement "[b]ecause a decision on [Defendants'] motion may dispose of all or some of the claims in this matter." (Dkt. 11.) The motion in question—which is styled as a motion to dismiss and for summary judgment—is now ripe for review. For the reasons stated herein, Defendants' motion is GRANTED in part and DENIED in part. The parties shall submit a proposed joint scheduling order no later than April 14, 2017. Among other things, the joint discovery and pre-trial motions scheduling order should specify a deadline by which Plaintiffs will move for leave to amend the complaint, if any such motion is anticipated.

## I. <u>Background</u>[1]

On January 7, 2015, Plaintiff Mervat Soliman and her son, Plaintiff Mohammed Soliman, had an altercation with their neighbor, non-party Faith Harrison, concerning a curbside parking spot outside their adjacent homes in Ridgewood, New York. (PCS ¶¶ 13-42; DCS ¶¶ 12-28.) Plaintiffs allege, and Defendants have not rebutted, that the altercation began when Harrison made threatening statements toward, and made physical contact with, Plaintiff Mervat. (PCS ¶¶ 13-42.) The details of the altercation are disputed in many respects, but Plaintiffs and Defendants agree that rude gestures and offensive language were exchanged. (PCS ¶¶ 13-42; DCS ¶¶ 12-28.)

At some point, Harrison's thirteen-year-old daughter ("S.V.") began using her cellphone to videotape the interaction. (DCS ¶ 11; DCS, Ex. G (Video Recorded by S.V.).) Defendants have submitted the videotape as an exhibit to their motion, and Plaintiffs appear to concede its

---

[1] The facts stated in this section are taken from the Complaint, the parties' Rule 56.1 Statements, and the record evidence cited therein, as noted by citation throughout this background section. (*See* Dkt. 1 ("Compl."); Dkt. 20 (Defendants' Concise Statement ("DCS")); Dkt. 27 (Plaintiff's Concise Statement ("PCS")).)

authenticity. When the videotape begins, Harrison is sitting in the driver's seat of a vehicle parked along the curb on the same side of the street as the camera, and Plaintiffs are standing across the street. (DCS ¶ 14.) Plaintiffs then cross the street and begin standing outside the driver's side of Harrison's vehicle. (DCS ¶¶ 19-22; DCS, Ex. G.) Mohammed and Harrison exchange offensive language in loud voices, and then Mervat begins walking toward the camera. (DCS ¶¶ 15-23; DCS, Ex. G; PCS ¶¶ 32-33.) As she approaches the camera, Mervat turns her head toward the camera, and then, with her right hand, strikes at the person holding the camera (S.V.). (DCS, Ex. G.) At the same time, Mervat says something sounding like, "this is what you do" or "this is what you get," after which there are muffled cries or yelling that appear to be coming from S.V.[2] (*Id*.) Before Mervat struck at S.V. with her right hand, the camera was stable, suggesting that S.V. had not moved prior to that moment. (*Id*.) After Mervat strikes at S.V., the camera moves around violently and does not depict the ensuing interaction between Mervat and S.V. (*Id*.) According to Plaintiffs, Mervat was thereafter struck in the head by S.V., causing Mervat to fall to the ground. (DCS ¶ 43.)

The NYPD received several reports concerning the altercation between Plaintiffs, Harrison, and S.V., including a report from an unidentified source who said that a group of people were fighting outside Plaintiffs' residence. (DCS ¶ 6.) The NYPD also received a report from Harrison, who stated that her daughter had been assaulted by two people. (DCS ¶¶ 4-7.)

Two police units arrived at the scene of the altercation within a few minutes of Harrison's call. (DCS ¶ 8.) The police officers, including Defendant Jared Ock, questioned Plaintiffs, Harrison, and S.V. about what had transpired between them. (DCS ¶ 10; PCS ¶¶ 44-45.)

---

[2] This inference is based on the voice being different than Mervat's voice and also having a timbre consistent with that of a young female.

Mohammed gave the officers his account of his altercation with Harrison and S.V. (PCS ¶ 45.) Harrison and S.V. gave their own accounts of the altercation, which included a statement that S.V. had been punched in the face by both Mervant and Mohammed. (DCS, Ex. F, at D195.) Harrison and S.V. also allowed the officers to view the video S.V. had recorded of the incident on her cellphone. (PCS ¶ 11.) The officers did not receive an account from Mervat at that time because, by the time the police arrived on the scene, Mervat was lying on the ground, unconscious, having allegedly been struck in the head by S.V. (PCS ¶ 44.)

After speaking with Mohammed, Harrison, and S.V., the police officers decided to arrest Mohammed and Mervat. (PCS ¶¶ 60-61, 69.) Defendant Ock placed Mohammed under arrest and transported him to the NYPD's 104th Precinct, where he was searched, fingerprinted, photographed, and placed in a holding cell. (PCS ¶¶ 60-61.)

Mervat was not transported directly to the 104th Precinct. Instead, she was placed in an ambulance, where she regained consciousness. (DCS ¶¶ 44-45.) Before being placed in the ambulance, Mervat was wearing a Hijab, a Muslim headscarf. (PCS ¶ 64.) But when she regained consciousness in the ambulance, Mervat discovered that she had been handcuffed and that her headscarf was no longer on her head. (DCS ¶ 47.) In the ambulance, paramedics applied an oxygen mask to Mervat and performed chest compressions. (DCS ¶ 48.) The officers escorting Mervat commented to the effect that she was faking her injuries and that she was a criminal. (PCS ¶ 68.) The ambulance delivered Mervat to a hospital. (PCS ¶ 69.)

Mervat was in the hospital for several hours, during which she remained handcuffed at all times. (PCS ¶¶ 72, 84.) Mervat underwent diagnostic testing, including an electrocardiogram and a CAT scan, and was treated for headaches, neck pain, and left shoulder pain resulting from her interaction with S.V. (PCS ¶ 75.) The testing resulted in a finding of headaches, dizziness, and

fainting, in addition to a "fall trauma" that was observed upon Mervat's admission.  (PCS ¶ 76.)

At some point, Mervat received a pillowcase from a nurse, which Mervat used to cover her hair,

in lieu of a headscarf.  (PCS ¶ 71.)

Sometime thereafter, while still at the hospital, Mervat asked the escorting officer whether

she could use the restroom.  (PCS ¶ 78.)  The officer refused Mervat's request, and Mervat was

not permitted to use the restroom for several hours. (PCS ¶ 79.)  The officer finally allowed Mervat

to use the restroom in response to pleading by hospital staff, but he refused to allow Mervat to

completely shut the door to the restroom.  (PCS ¶ 79.)  After Mervat had begun to use the restroom,

the officer began banging on the door.  (PCS ¶ 81.)  The officers (all male) then demanded that a

nurse immediately enter the restroom and pull Mervat out. (PCS ¶ 82.)  Complying with the

officers' instructions, the nurse barged into the restroom, unannounced, while Mervat's pants were

down, and instructed Mervat to leave the restroom.  (PCS ¶ 82.)  Mervat felt "violated and

exposed."  (PCS ¶ 83.)

Later that evening, Mervat was discharged from the hospital and taken by the escorting

officers to the NYPD's 104th Precinct.  (PCS ¶ 84.)  Upon arriving at the precinct, Mervat was

directed to remove her jacket, her blouse, and the pillowcase that was covering her hair.

(PCS ¶ 87.)  Mervat was then placed in a jail cell for several hours without food, heat or her "veil".[3]

(PCS ¶ 88.)  Mervat requested, but was refused, pain killers for the pain she was experiencing in

her chest, neck, and feet.  (PCS ¶ 89.)  Sometime after midnight, Mervat informed an officer that

she did not feel well, that her chest felt tight, and that she could not breathe.  (PCS ¶ 91.)  The

officer called her a fake and a liar, and attempted to shove Mervat toward the cell.  (PCS ¶ 92.)

---

[3] Plaintiffs use the term "veil" and "headscarf" interchangeably in the Complaint and their
motion briefing.  The Court therefore assumes that "veil" refers to Mervat's head covering, or
Hijab, which is visible in the video provided as Exhibit G to Defendants' motion.

Mervat fainted, and then she was escorted by Defendant Ock in shackles back to the hospital where she was treated the day before. (PCS ¶ 93.) Mervat was treated for dizziness and nausea, and then she was taken to the NYPD's central booking facility for processing. (PCS ¶¶ 95-96.)

During the booking process, Mervat was forced to remove her head covering. (PCS ¶ 96.)[4] When it came time for Mervat's photograph to be taken, Mervat requested that her photograph be taken by a female photographer. (PCS ¶ 97.) Mervat's request for a female photographer was denied, and her photograph was taken by a man in the presence of several other men. (PCS ¶ 97.) Mervat then asked for a translator and an opportunity to call her family, but those requests were denied. (PCS ¶ 98.)

Plaintiffs Mohammed and Mervat were both arraigned on January 8, 2015, on charges of Assault in the Third Degree (N.Y. Penal Law § 120.00-1), Endangering the Welfare of a Child (N.Y. Penal Law § 260.10-1), and Harassment in the Second Degree (N.Y. Penal Law § 240.26-1). (PCS ¶ 99.) On February 19, 2015, the district attorney added a charge of Penal Law 240.20 Disorderly Conduct. (PCS ¶ 100.) Plaintiffs then reached an agreement with the District Attorney's Office: In exchange for pleading guilty to the charge of Disorderly Conduct and completing two days of community service, Plaintiffs would receive an Adjournment in Contemplation of Dismissal ("ACD") of the counts against them, along with a three-month protection order barring them from contact with S.V. (PCS ¶ 101.) Plaintiffs entered guilty pleas to the Disorderly Conduct charge, and thereafter completed their two days of community service.

---

[4] The record is unclear as to when Mervat re-donned a head covering after the pillowcase was taken from her upon arrival to the 104th Precinct.

(PCS ¶ 102.)  Upon Plaintiffs' completion of their community service, their guilty pleas were vacated and replaced with ACDs.  (*Id.*)[5]

On March 2, 2015—almost two months after Plaintiffs were arraigned—the NYPD issued Interim Order 29, which revised the NYPD protocols for dealing with "arrestees who refuse to remove their religious head covering for an official Department photograph."  (PCS, Ex. DD, at 1.)  The Interim Order established a procedure whereby "an arrestee can remove their religious head covering and have their photograph taken in private."  (*Id.*)  The order distinguished between two types of photographs taken of an arrestee during the booking and detention process: (1) a Department photograph, which must be taken with "an unobstructed view of the arrestee's head, ears and face"; and (2) a Prisoner Movement Slip photograph, which "may be taken while the arrestee wears their religious head covering."  (*Id.*)  For the Department photograph, the Interim Order further provided that, if an arrestee refuses to remove her head covering, the arresting officer shall inform the arrestee of the option to have a photograph taken in private by officers of the same gender.  (*Id.*)  If the arrestee elects that option, the arresting officer must then transport the arrestee to the NYPD's centralized Mass Arrest Processing Center, "where the arrestee will have an official Department picture taken without their religious head covering" by an officer of the same gender.  (*Id.*)

---

[5] Plaintiffs' Rule 56.1 Statement contains numerous paragraphs concerning ongoing harassment by Harrison and S.V. after Plaintiffs' cases were ACD'ed. (*See* PCS ¶¶ 113-14.) None of the events described in these paragraphs were pleaded in Plaintiffs' complaint, and Plaintiffs fail to explain how any of the assertions in this part of their Rule 56.1 Statement are relevant to the motions before the Court.  The Court accordingly disregards these extraneous 56.1 statements, the inclusion of which is contrary to Local Rule 56.1.  The Court cautions Plaintiffs' counsel to be more scrupulous in the future about complying with the Local Rules.

## II. **Plaintiffs' Claims**

Plaintiffs commenced this action on September 14, 2015. They allege the following causes of action under 42 U.S.C. § 1983: (i) deprivation of Plaintiff Mervat's constitutional right to freely exercise her religion (Compl. ¶¶ 81-91); (ii) false arrest of both Plaintiffs (Compl. ¶¶ 92-95); (iii) malicious prosecution of both Plaintiffs (Compl. ¶¶ 96-105); (iv) failure to intervene to prevent violations of Plaintiffs' rights (Compl. ¶¶ 106-112); and (v) excessive force as to both Plaintiffs.

Plaintiffs also assert the following causes of action under New York law: (i) false arrest (Compl. ¶¶ 121-26); (ii) false imprisonment (Compl. ¶¶ 127-32); (iii) assault (Compl. ¶¶ 133-36); (iv) battery (Compl. ¶¶ 137-41); (v) religious discrimination as to Plaintiff Mervat (Compl. ¶¶ 142-45); (vi) intentional infliction of emotional distress (Compl. ¶¶ 146-52); (vii) negligent infliction of emotional distress (Compl. ¶¶ 153-59); (viii) *prima facie* tort (Compl. ¶¶ 160-65); (ix) negligent hiring and retention (Compl. ¶¶ 166-70); and (x) negligent training and supervision (Compl. ¶¶ 171-74).

All of Plaintiffs' claims except two—namely, their claims for negligent hiring and retention and for negligent training and supervision—are asserted against Defendant Ock. The negligent hiring, retention, training and supervision claims are asserted against the City of New York, acting through the NYPD. Plaintiff Mervat also appears to assert her free-exercise and religious discrimination claims against the City of New York, alleging that her rights to religious freedom were violated by Defendants' "practice" of requiring arrestees to remove their religious head coverings for their official Department photograph. (Compl. ¶ 86; *see also* Def.'s Br. 1 n.1 (construing Mervat's free-exercise claim as being asserted against the City of New York).)

### III.  Defendants' Motion to Dismiss

Defendants move under Fed. R. Civ. P. 12(b)(6) to dismiss the following claims: (i) Plaintiff Mervat's free exercise claim pursuant to 42 U.S.C. § 1983, (ii) Plaintiff Mervat's religious discrimination claim under New York law, (iii) Plaintiffs' claims of intentional infliction of emotional distress, (iv) Plaintiffs' claims of negligent infliction of emotional distress, (v) Plaintiffs' claims of *prima facie* tort, and (vi) Plaintiffs' claims of negligent hiring, retention, training, and supervision.  Defendants also move to dismiss all claims asserted against the NYPD on the ground that the NYPD is a non-suable entity.

#### A.  Legal Standard

To withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The liberal notice pleading standard of Fed. R. Civ. P. 8(a) only requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Id.* at 555.  The complaint need not set forth "detailed factual allegations," but the plaintiff must present "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.* at 555.  In evaluating a 12(b)(6) motion to dismiss, the district court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir. 2006).

#### B.  Analysis

##### 1.  Free Exercise of Religion

In their submissions, the parties construe the Complaint as alleging two distinct theories of liability for violation of Plaintiff Mervat's right under the U.S. Constitution to freely exercise her

religion. The first theory is that Mervat's free exercise rights were violated when her headscarf was removed at the scene of the altercation. The second theory is that Mervat's free exercise rights were violated when, during the booking process after her arrest, NYPD officers denied her request to be photographed outside the presence of male officers, and forced her to remove her headscarf and be photographed by a man in the presence of other men. (PCS ¶ 97.)

### a. Removal of Plaintiff Mervat's Headscarf at the Scene

Mervat alleges that an unspecified police officer violated her right under the First Amendment to the U.S. Constitution to freely exercise her religion when the officer "removed her veil" before placing her into an ambulance at the scene. (Pls.' Br. 9-10.) Mervat contends that the removal of her veil, or headscarf, at the scene, while she was unconscious, gives rise to a claim of First Amendment retaliation. (Pls.' Br. 10.)

To prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment rights." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

Mervat has failed to plausibly allege a First Amendment retaliation claim based on the removal of her headscarf at the scene. Setting aside for the moment the question of whether Mervat's interest in wearing her headscarf in public is an interest protected by the First Amendment, the Court finds that Mervat has failed to plead any facts suggesting, first, that an officer of the NYPD removed Mervat's headscarf at the scene, and, second, that Mervat's headscarf was removed for a reason related to the religious significance of the headscarf. To the contrary, even reading all allegations in the light most favorable to Mervat, the Complaint alleges only that Mervat was wearing the headscarf before she became unconscious, and then was no

longer wearing it when she regained consciousness in the ambulance. Even if the Court gives credence to Mervat's conclusory allegation that "a Police Officer removed [her] veil"—an allegation that Mervat makes notwithstanding the fact that she was unconscious when the removal allegedly occurred—nothing in the pleadings or record suggest that any such removal was motivated by religious considerations. The Court cannot make any plausible inferences about either the identity of the person who removed Mervat's headscarf or the person's motivation for doing so, especially when the alternative explanation—*i.e.*, that either a police officer or an emergency medical technician removed Mervat's veil to examine her head for injuries—is so patently clear. In short, even reading the Complaint in the light most favorable to Mervat, the Court holds that she has not plausibly alleged that any officer of the NYPD deliberately removed her headscarf for any reason related to her religion. Mervat's First Amendment claim, based on this first theory, therefore fails.

Furthermore, even if the Complaint adequately alleged a First Amendment claim based on this first theory, a civil action against the officer, if ever identified, would be barred by the doctrine of qualified immunity. "Under federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007) (quotation omitted). Mervat does not cite a single authority holding that a police officer violates the First Amendment by removing the headscarf of an unconscious woman before placing her in an ambulance for emergency treatment and transportation to a hospital, even if the woman turns out to be an observant Muslim. The Court's research also turns up no such authority. Tellingly, Mervat does not even address whether qualified immunity applies to the removal of her

headscarf at the scene. (Pls.' Br. 38.) Having neither been given, nor found, any legal authority suggesting that the removal of a headscarf in these circumstances would be a violation of the First Amendment, the Court grants Defendant Ock's motion to dismiss Mervat's First Amendment claim on the additional ground of qualified immunity.[6]

### b. Removal of Plaintiff Mervat's Headscarf During Booking

Mervat alleges that her constitutional right to freely exercise her religion was violated by the NYPD's policies, practices, and procedures of requiring arrestees to remove head coverings for photographs taken during the post-arrest booking procedure. (Pls.' Br. 11-13.) On this ground, Mervat asserts a claim under *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978), for money damages against the City of New York based on the emotional and psychological harm that Mervat suffered as a result of being forced to remove her head covering for a photograph taken by a man in the presence of other men. (Compl. ¶¶ 81-91.)[7]

---

[6] Plaintiff Mervat's submissions do not make clear whether she believes Defendant Ock or some other officer on the scene removed her headscarf. (Compl. ¶ 32; PCS ¶ 66.) In any event, absent evidence that the unidentified officer or officers were motivated by religious considerations when they removed Mervat's veil, the two grounds stated above for dismissing her First Amendment claim would apply with equal force to any officer who removed Mervat's headscarf in these specific circumstances. Plaintiffs' counsel should bear this in mind to the extent Plaintiffs seek to amend the Complaint in light of this order.

[7] It is unclear from the Complaint whether Mervat also asserts this claim against any individual officer of the NYPD. To the extent she does, those claims are dismissed on the ground of qualified immunity. As noted above, "[u]nder federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Jenkins*, 478 F.3d at 87. Plaintiffs expressly concede that "[t]he issue of whether or not an arrestee must remove religious headgear for the purpose of being photograph at central booking during post arrest processing is one of first instance for the Courts." (Pls.' Br. 9.) It follows then that Mervat cannot demonstrate that the legal authority existing at the time she was booked "clearly established" a statutory or constitutional right to keep her headscarf on during arrest photographing, as would be required to pursue her claim over an assertion of qualified immunity by Defendant Ock or any other "John Doe" police officer. Again, should Plaintiffs seek to amend

To plead a *Monell* claim, a plaintiff must allege "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Polo v. United States*, 2016 WL 4132250, at *3 (E.D.N.Y. Aug. 3, 2016) (quoting *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007)). Mervat alleges that, prior to March 2, 2015, including during the timeframe of Mervat's arrest, the NYPD had an official policy and custom of requiring arrestees to remove their head coverings, without affording them any accommodation of their religious beliefs, such as a same-gender photographer or a private room. (Compl. ¶¶ 81-91.) Also before the Court is a copy of Interim Order 29, which revised the NYPD protocols for dealing with "arrestees who refuse to remove their religious head covering for an official Department photograph." (PCS, Ex. DD, at 1.) Interim Order 29 corroborates Plaintiffs' allegations about the existence of a NYPD policy and custom at the time of Mervat's arrest that required arrestees to remove their head coverings, without affording them any accommodation based on their religious beliefs. The Court concludes that Plaintiffs have adequately pleaded a policy or custom.

Now to the core question, namely, whether, at the time of Mervat's arrest, the NYPD practice of requiring arrestees to remove their head coverings, either with or without affording them an accommodation based on their religious beliefs, constituted a violation of the U.S. Constitution. Mervat contends that the NYPD's policy of requiring all arrestees to remove head coverings for post-arrest photographs "is forbidden by the Constitution of the United States," *irrespective* of any accommodations the NYPD may make for arrestees who have religious beliefs related to their wearing of head coverings. (Pls.' Br. 11-12.) In other words, according to Mervat,

_____

their Complaint in light of this order, they should keep in mind that this would not be a viable claim as to any individual officer for this reason.

13

requiring arrestees to remove their head coverings can never be constitutional. The Court disagrees.

The Second Circuit has held that "[i]t is not a violation of the Free Exercise Clause to enforce a generally applicable rule, policy, or statute that burdens a religious practice, provided the burden is not the object of the law but merely the 'incidental effect' of an otherwise valid neutral provision." *Seabrook v. City of N.Y.*, 210 F.3d 355, at *1 (2d Cir. Apr. 4, 2000) (Table). "Where the government seeks to enforce a law that is neutral and of general applicability, . . . it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." *Fifth Ave. Presby. Church v. City of N.Y.*, 293 F.3d 570, 574 (2d Cir. 2002). As the Court can reasonably infer from Plaintiffs' submissions, even reading the record in the light most favorable to them, the policy and practice that Mervat challenges— *i.e.*, requiring all arrestees to remove head coverings for post-arrest photographs—is a neutral policy of general applicability, regardless of an arrestee's religious beliefs.[8] Furthermore, the policy is reasonably related to the City's obvious and legitimate interest in having a photographic record of arrestees from which a later identification can be made. (Defs.' Br. 11-13 (citing *Zargary v. City of N.Y.*, 607 F. Supp. 2d 609, 610 (S.D.N.Y. 2009), *aff'd*, 412 F. App'x 339, 341-42 (2d Cir. 2011).) Thus, to the extent that Mervat's argument is that *any* policy requiring arrestees to remove their head coverings for arrest photos is unconstitutional, that argument fails, because the Court would need to know more about the policy to evaluate its constitutionality, namely, whether the policy, either on paper or in practice, allows or prohibits religious accommodations

---

[8] Mervat does not allege that the NYPD's policy of requiring the removal of head coverings was implemented to target a particular religion or motivated by any religious animus, as would be required to invoke a more stringent standard of review. *See, e.g.*, *Muhammad v. N.Y.C. Transit Auth.*, 52 F. Supp. 3d 468, 489-90 (E.D.N.Y. 2014); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1992).

with respect to the removal requirement. In other words, as explained further below, the mere fact that the NYPD requires arrestees to remove their head coverings for arrest photographing is not itself unconstitutional, but the failure to offer a religious accommodation with respect to that removal may be.

Mervat's fallback argument is that the NYPD's policy violated her free-exercise rights because the NYPD failed to provide reasonable accommodation to her religious beliefs that prohibited her from removing her head covering in public or in front of men. (Pls.' Br. 15-17.) While the case law is far from clear in this area, the Court finds that this claim survives a motion to dismiss.

As discussed above, a neutral and generally applicable policy that only incidentally burdens a religious practice need only be supported by a rational basis. *Seabrook*, 210 F.3d 355, at *1; *Fifth Ave. Presby. Church*, 293 F.3d at 574. Defendants argue that the NYPD's policy of requiring all arrestees to remove their head coverings for arrest photographs meets that standard because it is a neutral and generally applicable policy that has a rational basis, *i.e.*, the need to visually record arrestees' appearances for potential identification in the future. (Defs.' Br. 11-13; *see also Zagary*, 607 F. Supp.2d at 610, *aff'd*, 412 F. App'x 339, 341-42 (2d Cir. 2011).) But Defendants do not address Plaintiffs' more subtle, fallback argument, *i.e.*, that the NYPD's pre-March 2, 2015 policy of no religious accommodation with respect to arrest photographing lacked a rational basis. (*See* Defs.' Br. 11-13; Defs.' Reply Br. 5-6.)

In addressing this narrower challenge to the NYPD's policy, the Court finds guidance in the body of caselaw addressing free-exercise claims brought by prisoners seeking accommodation

of their religious practices in the penological context.[9] That caselaw establishes a useful framework for determining whether the NYPD must modify its facially neutral policies to accommodate an arrestee's religious practices:

> Courts must evaluate four factors in making [this] determination: [1] whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [2] whether prisoners have alternative means of exercising the burdened right; [3] the impact on guards, inmates, and prison resources of accommodating the right; and [4] the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests.

*Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (citing *Turner v. Safley*, 482 U.S. 78, 84 (1987)).

Under this framework, the Court concludes that Mervat has plausibly alleged a constitutional right to have her official Department photograph taken outside the presence of male officers, as required by her religious beliefs. With respect to the first factor, as noted above, the Court recognizes the NYPD's legitimate interest in having a photographic record of arrestees from which a later identification can be made. With respect to the second factor, the Court finds that female arrestees whose religious beliefs prohibit them from removing their head coverings in the presence of men have no alternative means of complying with the NYPD's post-arrest photographing policy while adhering to their religious beliefs, other than to have their photograph

---

[9] Although "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," prisoners are nonetheless entitled to reasonable accommodation of their religious practices, even when incarcerated. *See Salahuddin v. Goord*, 467 F.3d 263, 273-74 (2d Cir. 2006) (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)). An arrestee in the custody of the police is entitled to at least the same reasonable accommodation as a prisoner. *See id.* (applying a "less restrictive" review to prison policies than would be applied outside the prison context). Accordingly, the Court adopts the framework used in the prison context to evaluate whether an arrestee's requested accommodation is required by the Constitution, while keeping in mind that the arrestee's right to accommodation is arguably greater than that of a prisoner.

taken outside the presence of men. With respect to the third factor, the Court finds that Mervat has plausibly alleged that the impact on NYPD resources of accommodating Mervat's religious beliefs would be minimal, especially considering that the NYPD instituted a policy of accommodation (Interim Order 29) just months after Mervat was arrested. Finally, with respect to the fourth factor, the Court finds that accommodating an arrestee's request, based on religious practices, to have his or her photograph taken outside the presence of members of the opposite gender would have, at most, a *de minimis* adverse effect on the NYPD's valid interests in having a photographic record of arrestees from which a later identification can be made.

Accordingly, the Court denies Defendants' motion to dismiss Mervat's free-exercise claim to the extent it is based on the theory that the NYPD had no rational basis for refusing to accommodate Mervat's religious beliefs by allowing her to be photographed by a female officer outside the presence of male officers.

### 2. Religious Discrimination

In addition to her claim under the free-exercise clause, Plaintiff Mervat also asserts a claim of religious discrimination under the New York Constitution. Article I of the New York Constitution, titled Bill of Rights, protects the "[f]reedom of worship; religious liberty." N.Y. Const., Art. I, § 3. Section 11 of the New York Bill of Rights prohibits "discrimination because of race, color, creed, or religion." N.Y. Const., Art. I § 11. Rather than explain the contours of these rights, the parties have devoted most of their arguments on this issue to debating whether the New York Constitution implies a private right of action for money damages based on religious discrimination. (*See* Pls.' Br. 17-18; Defs.' Br. 13-14.)

As an initial matter, the Court holds that Plaintiffs do not have a private right of action for religious discrimination under Section 11 of the New York Constitution. This conclusion flows

directly from the New York Court of Appeals' decision in *Brown v. New York*, 674 N.E. 2d 1129 (1996), which held that "[i]t is implicit in the language of [the second sentence of Section 11], and clear from a reading of the constitutional debates, that this part of the section was not intended to create a duty without enabling legislation but only to state a general principle recognizing other provisions in the Constitution . . . ." 674 N.E. 2d at 1139-40.

The more difficult question is whether Plaintiffs have a private right of action under Section 3 of the New York Bill of Rights (Pls.' Br. 17). This appears to be a novel question of New York law. In *Martinez v. City of Schenectady*, 761 N.E. 2d 560 (2001), building on its decision in *Brown v. New York*, *supra*, the New York Court of Appeals provided general guidance on the circumstances in which a court may recognize an implied right of action to enforce provisions of the New York Constitution. 761 N.E. 2d at 563-64. As a preliminary matter, the *Martinez* court stated that the inquiry is informed by two interests: "the private interest that citizens harmed by constitutional violations have an avenue of redress, and the public interest that future violations be deterred." *Id.* at 563. The *Martinez* court then clarified that courts should recognize an implied right of action under the New York Constitution only where the implied right is "necessary to effectuate the purpose of the constitutional protections the plaintiff invokes," and "appropriate to ensure full realization of [the plaintiff's] rights." *Id.* at 563-64; *accord Bullard v. New York*, 763 N.Y.S. 2d 371, 374 (App. Div. 2003); *Biswas v. City of N.Y.*, 973 F. Supp. 2d 504, 522-23 (S.D.N.Y. 2013).

At least one federal court has considered whether to recognize an implied right of action under the New York Constitution for the type of claim Plaintiffs seek to pursue in this case—*i.e.*, a claim alleging infringement of the right under the New York Constitution to freely exercise one's religion. *See Muhammad v. N.Y.C. Transit Auth.*, 450 F. Supp. 2d 198 (E.D.N.Y. 2006). In

*Muhammad*, the court declined to recognize an implied right of action under Article I, Section 3 of the New York Constitution because the plaintiffs in that case had "at least [one] alternative avenue"—specifically, a claim under the New York Human Rights Law, N.Y. Exec. Law §§ 296-97—"for redressing the alleged religious discrimination." 450 F. Supp. 2d at 211-12.

Numerous other courts have applied the *Martinez* decision to determine whether to recognize an implied right of action under other provisions of the New York Constitution. *See, e.g.*, *Biswas v. City of N.Y.*, 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013) (collecting cases). The general trend through those cases is that, where alternative remedies are available for an alleged violation of rights under the New York Constitution—whether those remedies are under state or federal law—a court does not recognize an implied right of action under the New York Constitution. *See id.* (collecting cases). Under this line of cases, the Court could dismiss Mervat's claim under the New York Constitution because, as the Court has already held, Mervat may seek remedies under the U.S. Constitution. *See supra.*

Nonetheless, the Court declines to dismiss Mervat's claim under the New York Constitution at this time. Although there is a trend in federal caselaw to decline to recognize an implied right of action under the New York Constitution where there is an adequate remedy under federal law, *see Biswas*, 973 F. Supp. 2d at 522, these cases do not identify any basis in New York law to deny a right of action under the New York Constitution based on remedies that may be obtainable under *federal* law. *See id.* Given that the New York Constitution creates rights and protections that are independent from the rights and protections afforded under federal law, *see, e.g.*, *Immuno AG v. Moor-Jankowski*, 657 N.E.2d 1270, 1277-78 (N.Y. 1991), the Court is

reluctant to conclude that Mervat's claim under federal law is adequate to fully vindicate her rights under the New York Constitution.[10]

With respect to the merits of Mervat's religious discrimination claim, Defendants assert that Mervat's claim "fails for the [same reasons that her federal claim fails], because the state constitution is coextensive with the First Amendment." (Defs.' Br. 13.) Even assuming that Mervat's free-exercise rights under state and federal law are co-extensive, the Court nonetheless denies Defendants' motion to dismiss Mervat's religious discrimination claim because, as noted above, Mervat has stated a plausible free-exercise claim under the First Amendment. *See supra*.

For these reasons, the Court denies Defendants' motion to dismiss Mervat's claim of religious discrimination under the New York Constitution.

### 3. Intentional Infliction of Emotional Distress

To prevail on a claim of intentional infliction of emotional distress ("IIED") under New York law, a plaintiff must show (i) extreme and outrageous conduct, (ii) intent to cause, or disregard of a substantial likelihood of causing, severe emotional distress, (iii) a causal connection between the conduct and injury, and (iv) severe emotional distress. *Bailey v. N.Y. Law School*,

---

[10] If, at a later stage of proceedings, Defendants wish to re-assert their argument that Mervat does not have a private right of action under the New York Constitution, Defendants are advised to (i) identify New York state law authority for the proposition that an adequate remedy under federal law is sufficient to preclude an implied right of action under the New York Constitution, and (ii) explain in non-conclusory fashion how Mervat's religious rights under the New York Constitution are, in these factual circumstances, adequately protected by the remedies she may seek under federal law. In addition, Plaintiff should be aware that, if this issue is raised again in future stages of this action and, in the interim, the New York courts have not provided any guidance on whether an implied right of action exists under Section 3 of the New York Bill of Rights, the Court will likely decline to exercise supplemental jurisdiction over Plaintiff's claim under that section, on the ground that it "raises a novel or complex issue of State law." *Kroshnvi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014). Plaintiff's counsel should consider the potential ramifications of such a ruling in deciding whether to continue pursuing Plaintiff's State constitutional claim in this court.

2017 WL 835190, at \*10 (S.D.N.Y. Mar. 1, 2017) (citing *Howell v. N.Y. Post. Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)).

Mervat argues that she was the victim of IIED by the police officers who monitored her at the hospital where she was taken after the altercation with Harrison and S.V., and the officers who monitored her at the 104th Precinct following her arrest. (Pls.' Br. 21-22.)[11] According to Plaintiff, the police officer monitoring her at the hospital is liable for IIED based on the following conduct: (i) aggressively and viciously pushing Mervat around in the hospital; (ii) refusing to let Mervat use the restroom; (iii) refusing to let Mervat close the door when using the restroom; (iv) instructing a nurse to barge in on Mervat while she had her pants down in the restroom; and (v) forcing Mervat to leave the restroom before she was fully dressed, all of which caused severe emotional distress to Mervat. (Pls.' Br. 21-22.) Mervat further asserts that the police officers at the 104th Precinct, where she was detained before booking, are liable for IIED for: (i) detaining Mervat for several hours without providing her a blanket, food, or heat; and (ii) ignoring Mervat's complaints of head and chest pain. (Pls.' Br. 22.) Mervat also asserts that her IIED claim "arises from . . . the removal of her Hijab." (Pls.' Br. 23.)

Although, as discussed further *infra*, the circumstances that Mervat alleges state a Section 1983 claim for unconstitutional conditions of pre-trial confinement, *see Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017)—a claim that the Complaint does not currently assert—they are insufficient to state a claim for relief under an IIED theory.

---

[11] Because Plaintiffs allege no facts showing that Plaintiff Mohammed was subjected to any form of extreme or outrageous conduct, the Court construes the IIED claim as only being alleged by Plaintiff Mervat. However, to the extent that Plaintiffs are asserting an IIED claim on Mohammed's behalf, that claim is dismissed.

With respect to Plaintiff Mervat's argument that "the removal of her Hijab" gives rise to an IIED claim, the Court finds that the Complaint fails to plead facts showing a pattern of harassment by any defendant that could rise to the level of "extreme and outrageous" conduct required to sustain an IIED claim. *See Lopez v. City of N.Y.*, 901 F. Supp. 684, 692 (S.D.N.Y. 1995). "These requirements are exceedingly difficult to satisfy, as the tort refers to conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Fleming v. Hymes-Esposito*, 2013 WL 1285431, at *9 (S.D.N.Y. Mar. 29, 2013) (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E. 2d 86, 90 (N.Y. 1983)). Even assuming a NYPD officer removed Mervat's headscarf before she was placed in the ambulance, that isolated incident could not sustain an IIED claim. *See, e.g.*, *Anderson v. Abodeen*, 816 N.Y.S. 2d 415, 432 (App. Div. 2006) (plaintiff's allegations that his supervisor "displayed . . . nude photos [of plaintiff]" in the workplace "does not show conduct sufficiently outrageous to support a claim of intentional infliction of emotional distress"); *Seltzer v. Bayer*, 709 N.Y.S. 2d 21, 23 (App. Div. 2000) (holding that "dump[ing] a pile of cement on [neighbor's sidewalk], toss[ing] lighted cigarettes into his backyard, thr[owing] eggs on his front steps, and threaten[ing] once to paint a swastika on his house . . . do not rise to the level of outrageousness or the kind of 'deliberate and malicious campaign of harassment or intimidation'" required to state an IIED claim); *see also Lopez*, 901 F. Supp. at 692 (collecting cases). Furthermore, as discussed in the context of qualified immunity, the act of removing Mervat's headscarf under the circumstances of this case, was not a clear violation of the law.[12]

---

[12] Plaintiffs also appear to argue that Defendant Ock committed an IIED by arresting Plaintiffs without probable cause. (Pls.' Br. 22.) That claim is dismissed because, in New York, "intentional infliction of emotional distress is a theory of recovery that is to be invoked only as a

Mervat's IIED claim also fails to the extent it rests on her alleged mistreatment by the police officers who monitored her in the hospital on January 7, 2015, and in the 104th Precinct before her booking procedures. As mentioned earlier, Mervat's allegations that she was mistreated while in police custody, though not currently pled as such, are sufficient to support a Section 1983 claim of unconstitutional conditions of pretrial detention. *See Darnell v. Pineiro*, 849 F.3d 17, 29-36 (2d Cir. 2017); *Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 463-64 (E.D.N.Y. 2010). The case law in New York makes clear that IIED "is a theory of recovery that is to be invoked only as a *last* resort." *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 682 N.Y.S. 3d 167, 169 (App. Div. 1998); *see also Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 483 (E.D.N.Y. 2016). Thus, because Mervat's alleged mistreatment while in police custody gives rise to at least one other claim, it cannot be pursued under a theory of IIED.[13]

For these reasons, the Court dismisses Plaintiffs' claims for intentional infliction of emotional distress.

### 4. Negligent Infliction of Emotional Distress

To state a claim for negligent infliction of emotional distress, a plaintiff must allege "[a] breach of the duty of care resulting directly in emotional harm . . . when the mental injury is a

---

last resort," *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 682 N.Y.S. 3d 167, 169 (App. Div. 1998), and therefore cannot be invoked to the extent it overlaps with Plaintiffs' claim for false arrest.

[13] To the extent Mervat wishes to pursue a claim of mistreatment during pretrial detention, she may amend her complaint to add that claim. Her counsel is reminded, however, to comply with his obligations under Fed. R. Civ. P. 11 to conduct adequate research of the facts and law before amending the complaint to add such a claim. *See, e.g., Pineiro*, 849 F.3d at 29-36 (plaintiff alleging unconstitutional pre-trial conditions of confinement "must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of due process, and a 'subjective prong'—perhaps better classified as a '*mens rea* prong' or 'mental element prong'—showing that the officer acted with at least deliberate indifference to the conditions").

direct, rather than a consequential, result of the breach and when the claim possesses some guarantee of genuineness." *Ornstein v. N.Y.C. Health & Hosps. Corp.*, 881 N.E. 2d 1187, 1189 (N.Y. 2008). As fleshed out by New York caselaw, the latter element—guarantees of genuineness—generally requires a specific, recognized type of negligence that obviously has the propensity to cause extreme emotional distress, "[such as] the mishandling of a corpse or the transmission of false information that a parent or child had died." *Taggart v. Costabile*, 14 N.Y.S. 3d 243, 253 (App. Div. 2015). Otherwise, the "guarantees of genuineness" element "generally requires that the breach of the duty owed directly to the injured party must have at least endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her own physical safety." *Id.*

Here, the Complaint does not allege circumstances that even remotely resemble those that could sustain a claim for negligent infliction of emotional distress. It does not allege any specific duty owed by any Defendant to either Plaintiff; it does not allege a type of negligence that obviously would have the propensity to cause severe emotional distress; and it does not allege negligence that endangered either Plaintiff's physical safety or caused either Plaintiff to fear for his or her own physical safety. Moreover, like claims for IIED, a claim for negligent infliction of emotional distress can be asserted only as a last resort, and should be dismissed if plaintiff can assert liability based on the same facts and circumstances under another cause of action. As previously discussed, Plaintiff Mervat's allegations that she was mistreated while in police custody should have been asserted as a claim of mistreatment during pretrial detention, *see, e.g.*, *Darnell*, 849 F.3d at 29-36; *Nimkoff*, 751 F. Supp.2d at 463-64; *Hart*, 2013 WL 6139648, at *7-8, and thus cannot be pursued under a theory of negligent infliction of emotional distress.

For these reasons, the Court dismisses Plaintiffs' claims for negligent infliction of emotional distress.

### 5. *Prima Facie* Tort

To plead a claim of *prima facie* tort, a plaintiff must allege: "(1) the intentional infliction of harm, (2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful." *Berland v. Chi*, 38 N.Y.S. 3d 57, 59 (App. Div. 2016). Plaintiffs' claim for *prima facie* tort fails for two reasons. First, allegations that generally "amount[] to a claim of emotional distress," which is all that Plaintiffs' allege in connection with their claim for *prima facie* tort (Compl. ¶ 164), "are insufficient to allege special damages." *Id.* Second, a claim of *prima facie* tort must be predicated on allegations of acts that "would otherwise be lawful . . . but for defendant's disinterested malevolence." *Chen v. United States*, 854 F.2d 622, 627-28 (2d Cir. 1988). Plaintiffs do not make any such allegations. Plaintiffs' claims for *prima facie* tort are dismissed.

### 6. Negligent Hiring, Retention, Training, and Supervision

Plaintiffs assert separate claims against the City, acting through the NYPD, for negligent hiring/retention and negligent training/supervision. To state a claim for negligent hiring, retention, training, or supervision, a plaintiff must plausibly allege, in addition to the elements of standard negligence, that "(1) the tort-feasor and the defendant were in an employee-employer relationship, (2) the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence, and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (internal citations and quotation marks omitted). Such a claim cannot be sustained, however, when the defendant acts within the scope of his or her employment. *See, e.g.*, *Newton v. City of N.Y.*, 681 F. Supp. 2d 473, 494-95 (S.D.N.Y. 2010).

Here, other than alleging that Defendant Ock and the "John Doe" officer defendants were employed by the NYPD, Plaintiffs fail to allege any facts to support any other element of their negligent hiring/retention and negligent training/supervision claims. For example, the Complaint does not allege any specific facts concerning the hiring, retaining, training, or supervising of any officer who allegedly engaged in misconduct with respect to Plaintiffs—let alone any facts showing that the NYPD "knew or should have known of the [officers'] propensity for the conduct which caused [Plaintiffs' alleged] injury"— as would be required to plausibly allege this claim. *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S. 2d 791 (App. Div. 1997).

Furthermore, Plaintiffs expressly allege that Defendant Ock and the "John Doe" officer defendants were acting within the scope of their employment at all times in dealing with Plaintiffs. (Compl. ¶¶ 15-17.) For this reason alone, Plaintiffs' claims should be dismissed. *See Newton*, 681 F. Supp. 2d at 494-95. However, Plaintiffs argue that their claims fall into an exception to the general rule that such claims cannot be sustained when a defendant acts within the scope of his or her employment. Plaintiffs argue that their negligent hiring/retention and negligent training/supervision claims survive because the officers involved in their arrests and detention "evidence[d] a high degree of moral culpability" sufficient to demonstrate "gross negligence" in hiring, training, or supervising the officers. (Pls.' Br. 23.) The Court rejects this argument because the Complaint neither specifically alleges "gross negligence" nor facts supporting such an inference. (*See* Compl. ¶¶ 166-70.)

Accordingly, Plaintiffs' negligent hiring/retention and negligent training/supervision claims are dismissed.

### 7. Dismissal of Claims Against the NYPD

The New York Police Department ("NYPD") is a non-suable agency of the City of New York. *Jenkins v. City of N.Y.*, 478 F.3d 76, 93 n.19 (citing N.Y.C. Charter § 396). Accordingly, Plaintiffs' purported claims against the NYPD are dismissed.

## IV. <u>Defendants' Motion for Summary Judgment</u>

Defendants move under Fed. R. Civ. P. 56 for summary judgment on the following claims: (i) Plaintiffs' claims of false arrest and false imprisonment under 42 U.S.C. § 1983 and State law, (ii) Plaintiffs' claims for malicious prosecution under 42 U.S.C. § 1983 and State law, (iii) Plaintiffs' claim for failure to intervene pursuant to 42 U.S.C. § 1983, (iv) Plaintiffs' claims for excessive force under 42 U.S.C. § 1983, (v) Plaintiffs' State law claims for assault, and (vi) Plaintiffs' State law claims for battery.

### A. Legal Standard

Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006). "To grant the motion, the court must determine that there is no genuine issue of material fact to be tried." *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)). A genuine factual issue exists where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), or by a factual argument based on "conjecture or surmise," *Bryant v.*

*Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "[What] is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 288-89 (1968). "Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir. 1997).

### B. Analysis

#### 1. False Arrest and Imprisonment

"A § 1983 claim for false arrest [or false imprisonment][14], resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *see Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant*, 101 F.3d at 852)). To prevail on a claim of false arrest or unlawful imprisonment, a plaintiff must prove that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of N.Y.*, 331 F. 3d 63, 74 (2d Cir. 2003) (quotation omitted). "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'" *Weyant*, 101 F.3d at 852 (quotation omitted). Furthermore, "[w]hen a Section 1983 plaintiff is convicted after trial

---

[14] Under New York law, false arrest and false imprisonment are "synonymous." *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991); *see also Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("The common law tort of false arrest is a species of false imprisonment.") (citing *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)); *Mitchell v. Home*, 377 F. Supp. 2d 361, 371 n.3 (S.D.N.Y. 2005) ("The right against false imprisonment in the criminal prosecution context extends only to pre-trial detention, rendering false arrest and false imprisonment synonymous.").

on the underlying charge, or when a plaintiff pleads guilty to the underlying or a lesser charge, these facts *alone* provide sufficient evidence that probable cause existed at the time of arrest and preclude a false arrest claim under Section 1983." *Feurtado v. Gillespie*, 2005 WL 3088327, at *4 (E.D.N.Y. Nov. 17, 2005) (internal citations omitted); *accord Butron v. Cnty. of Queens Police Dep't*, 1996 WL 738525, at *2 (E.D.N.Y. Dec. 23, 1996) (collecting cases); *see also New York v. Plunkett*, 971 N.E. 2d 363, 366 (N.Y. 2012) (reiterating principle of New York law that "solemn act of entering a [guilty] plea . . . suffic[es] as a conviction"). Indeed, application of the common law defense of conviction to preclude a false arrest claim where the defendant pled guilty to a crime arising from the arrest is well established, even where the plea is to a lesser charge. *See Cameron v. Fogarty*, 806 F.2d 380, 386-89 (2d Cir. 1986) (establishing that even though a conviction does not always preclude a claim for false arrest under principles of *res judicata* or collateral estoppel, the "common law defense of conviction" to a false arrest claim provides immunity to the arresting police officer); *Johnson v. City of N.Y.,* 551 F. App'x 14, 15 (2d Cir. 2014) (citing *Cameron*); *Timmins v. Toto*, 91 F. App'x 165, 166 (2d Cir. 2004) (summary order) ("[I]n this Circuit, a plaintiff cannot establish any [false arrest or malicious prosecution] claim if he pleads guilty to a lesser offense pursuant to a plea agreement." (citing *Maietta v. Artuz*, 84 F.3d 100, 102 n.1 (2d Cir. 1996)).

The Court grants Defendants' motion for summary judgment on Plaintiffs' false arrest claims on multiple independent grounds.

First, Plaintiffs' decision to plead guilty to Penal Law 240.20 Disorderly Conduct "provide[s] sufficient evidence that probable cause existed at the time of arrest and preclude[s] a false arrest claim." *Feurtado*, 2005 WL 3088327, at *4. Seeking to avoid summary judgment on this ground, Plaintiffs argue that they "have not had a full and fair opportunity to litigate [the] issue

of probable cause," and that their false arrest claim is not precluded because they pleaded guilty to a different charge (Disorderly Conduct) than the offenses for which they were allegedly arrested (Assault, Endangering the Welfare of a Child, and Harassment). (Pls.' Br. 27-28 (emphasizing that Plaintiffs pleaded guilty to a different charge than "any offenses for which they were arrested").) Neither of these arguments is availing. The fact that Plaintiffs have not litigated the issue of probable cause is irrelevant because the Court's ruling is not based on a finding of collateral estoppel based on their guilty pleas, but rather, the Court holds that Plaintiffs' claims of false arrest are precluded because their entry of a guilty plea constitutes a criminal conviction, which, in turn, creates an irrebuttable presumption of probable cause to arrest for purposes of a false arrest claim. *Feurtado*, 2005 WL 3088327, at *4; *Butron*, 1996 WL 738525, at *2. And the distinction that Plaintiffs draw between the offense to which they pleaded guilty and those "for which they were arrested" (Pls.' Br. 28) is equally immaterial. It is well established that "a claim for false arrest turns only on whether probable cause existed to arrest defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 153-54 (2d Cir. 2006).[15]

Second, Plaintiffs' claim of false arrest fails because, as a matter of law, Defendant Ock is entitled to qualified immunity on the false arrest claim. Under the doctrine of qualified immunity, Ock cannot be held liable for falsely arresting Plaintiffs unless (1) his conduct "violate[d] clearly

---

[15] Plaintiffs cite no authority for their contentions that their guilty pleas to an offense other than the ones for which they were arrested do not establish probable cause for purposes of the false arrest claims. Nor do they acknowledge *Cameron, Jaegly* and the numerous other reported and/or precedential Second Circuit cases that directly contradict their argument. The Court again cautions Plaintiffs' counsel to research his arguments and claims before asserting them to avoid frivolous ones, such as this, as the case proceeds.

established statutory or constitutional rights of which a reasonable person would have known," and (2) it was "objectively unreasonable" for him to believe that his actions were lawful at the time of the alleged act. *Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007). As applied to a claim for false arrest alleging lack of probable cause, which is what Plaintiffs allege here, qualified immunity insulates a police officer from liability if it was "objectively reasonable" to believe that probable cause existed to arrest, *i.e.*, if there was "arguable probable cause."

Given the record evidence here, the Court concludes, as a matter of law, that Defendant Ock had arguable probable cause to arrest Plaintiffs for the events on January 7, 2015. Ock received an eyewitness report from Harrison stating that S.V. had been assaulted by both Plaintiffs, who were still on the scene. Generally, this kind of eyewitness report alone would be sufficient to establish probable cause, where the officer had no reason to question the witness's veracity or the reliability of his or her account. *See, e.g.*, *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000); *Wahhab v. City of N.Y.*, 386 F. Supp. 2d 277, 287 (S.D.N.Y. 2005); *see also Celestin v. City of N.Y.*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) ("a positive photo identification by an eyewitness is normally sufficient to establish probable cause", except where the identification procedure is "too unreliable to establish probable cause"); *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (noting that probable cause may not exist if there are doubts as to witness's veracity). Plaintiffs seek to raise doubts about the reliability of Harrison's eye-witness report, alleging, *inter alia*, that Defendant Ock and the NYPD were aware of a longstanding pattern of harassment by Harrison of Plaintiffs, which should have prompted Ock to discredit Harrison's report of assault. (Pls.' Br. 26.) But these arguments about the history of antagonism between Harrison and Plaintiffs are largely beside the point, in light of the video footage that S.V. showed to Ock before any arrests were made. That video—the authenticity of which Plaintiffs do not dispute—clearly depicts

Plaintiff Mohammed yelling offensive language at Harrison, and depicts Plaintiff Mervat striking at S.V. with her right hand. Regardless of the history that may have precipitated the altercation that day or the alternate version of events that Plaintiffs may have provided to Ock at the scene, there is no question that Harrison's report, combined with S.V.'s video, provided *at least* arguable probable cause to arrest Plaintiffs, such that Ock is entitled to qualified immunity with respect to the arrest. Plaintiffs' claims of false arrest and imprisonment therefore fail on this additional ground.[16]

Accordingly, Plaintiffs' claims of false arrest and imprisonment are dismissed with prejudice.

### 2. Malicious Prosecution

To prevail on a claim of malicious prosecution, a plaintiff must prove that "(1) the defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted with actual malice." *Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991). A claim for malicious prosecution under 42 U.S.C. § 1983 is substantially the same as a claim for malicious prosecution under New York law. *See Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003).

The Court easily grants Defendants' motion for summary judgment on Plaintiffs' claims for malicious prosecution because the prosecutions that Plaintiffs challenge did not "terminate[] in [their] favor." *Posr*, 944 F.2d at 100. "A termination [of criminal proceedings] is not favorable

---

[16] Having found that Defendant Ock is entitled to qualified immunity on Plaintiffs' false arrest and imprisonment claims on the basis that he had arguable probable cause, the Court need not address whether the record establishes probable cause as a matter of law. *See Costello v. Milano*, 20 F. Supp. 3d 406, 419 n.12 (S.D.N.Y. 2014).

to the accused . . . if the charge is withdrawn or the prosecution abandoned pursuant to a compromise with the accused." *Poventud v. City of N.Y.*, 750 F.3d 121, 131 (2d Cir. 2014). Plaintiffs concede that their prosecution for the events of January 7, 2015, terminated in an Adjournment of Dismissal "in exchange for pleading guilty to Penal Law 240.20 Disorderly Conduct [and] perform[ing] two days of community service." (PCS ¶ 101.) This "exchange" precludes Plaintiffs from pursuing a claim of malicious prosecution based on the events of January 7, 2015. *Poventud*, 750 F.3d at 131. Furthermore, this rule applies even though Plaintiffs pleaded guilty to a lesser offense than those charged in the initial criminal complaint. *See id.* (citing *DiBlasio v. City of N.Y.*, 102 F.3d 654, 657 (2d Cir. 1996)).

Accordingly, Plaintiffs' malicious prosecution claims are dismissed with prejudice.[17]

### 3. Excessive Force

To prevail on a § 1983 claim of excessive force, a plaintiff must show that the defendant used physical force against her that was objectively unreasonable in the circumstances. *Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 430-31 (S.D.N.Y. 2012) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)). To determine whether the use of force was unreasonable, a court must consider the specific facts in each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Hayes v. N.Y.C. Police Dep't* ("*Hayes*"), 212 F. App'x 60, 61 (2d Cir. 2007). When deciding whether the use of force was reasonable in a given case, a court "[must] allow[] for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a

---

[17] Again, given the obvious, undisputed, and fatal defect in Plaintiffs' malicious prosecution claims, the Court is concerned about the diligence of Plaintiffs' counsel in bringing these claims in the first place.

particular situation." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). However, "[o]fficers may not . . . gratuitously inflict pain in a manner that is not a reasonable response to the circumstances." *Diaz v. City of N.Y.*, 2006 WL 3833164, at *6 (E.D.N.Y. Dec. 29, 2006) (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124 (2d Cir. 2004)).

Plaintiff Mervat alleges[18] that she was subjected to excessive force in the form of overly tight handcuffs and aggressive pushing. (Compl. ¶¶ 113-120.) Mervat asserts that these acts of excessive force occurred while she was at the hospital, in the custody of an unidentified police officer. (Compl. ¶¶ 36, 43.) Mervat further asserts that she complained to the officer about how tight the handcuffs were, and that she suffered bruising as a result. (PCS ¶ 85.) At the same time, however, Mervat admits in her Rule 56.1 Statement that she did not suffer any significant physical injury as a result of being pushed by the officer. (Pls.' Response to DCS ¶ 56.) Mervat's hospital records also indicate that "there was no redness or bruising to Mervat." (DCS ¶ 59.)[19]

Defendants argue that summary judgment as to Mervat's claim of excessive force is appropriate because neither a single push, nor an allegation of tight handcuffs, is sufficient to

---

[18] Although the excessive force claim nominally has been alleged by both Plaintiffs, the Complaint contains no allegations suggesting any use of excessive force against Plaintiff Mohammed. To the extent the Complaint attempts to allege an excessive force claim on behalf of Mohammed, that claim is dismissed. The Court accordingly addresses the excessive force claim only as to Plaintiff Mervat.

[19] Hospital records are admissible under the business records exception. *See Parks v. Blanchette*, 144 F. Supp.3d 282, 292 (D. Conn. 2015) (finding medical records submitted by defendants in connection with summary judgment motion would be admissible under business records exception provided they meet the requirements of Fed. R. Evid. 803(6), *i.e.*, "the documents must have been made near the time of the recorded event by someone with knowledge and must have been kept in the course of regularly conducted business activity"); *Gissinger v. Yung*, 2007 WL 2228153, at *4 (E.D.N.Y. July 31, 2007) ("If properly authenticated and created in the regular course of business contemporaneously with the occurrence by a person with knowledge, medical records can be admissible as business records." (citing *Hodges v. Keane*, 886 F. Supp. 352, 356 (S.D.N.Y. 1995))). Plaintiffs also have not objected to the admissibility of Plaintiff Mervat's hospital records for purposes of Defendants' summary judgment motion.

sustain an excessive force claim, where the plaintiff does not demonstrate any resulting physical harm. (Def.'s Br. 33-35.) The Court agrees. The law is clear that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)); *see Hayes*, 212 F. App'x at 61. Mervat's assertion that she was "pushed and shoved" by an escorting officer after her arrest—in the absence of an assertion that she was pushed to the ground or physically injured in any way—is exactly the kind of *de minimus* force that cannot support a constitutional claim. *See, e.g.*, *Nogbou v. Mayrose*, 2009 WL 3334805, at *6-7 (S.D.N.Y. Oct. 15, 2009) (granting defendants' motion for summary judgment on excessive force claim, where plaintiff asserted that police officers kicked him, dragged him out of a cardboard box, and "violently pushed" him into an ambulance, but no injury was shown), *aff'd*, 400 F. App'x 617, 619 (2d Cir. 2010); *Petway v. City of N.Y.*, 2014 WL 839931, at *8 (Mar. 4, 2014) (granting defendants' motion for summary judgment on excessive force claim, where plaintiff admitted that he received a "slight shove" causing him no physical pain or injury). Furthermore, even crediting Mervat's claim that she suffered bruising from being handcuffed too tightly, the Court still finds that summary judgment is appropriate because, as a matter of law, "tight handcuffing does not constitute excessive force unless it causes injuries *beyond pain and bruising*." *See Higginbotham v. City of N.Y.*, 105 F. Supp. 369, 377 (S.D.N.Y. 2015) (emphasis added) (citing cases).

Accordingly, Plaintiff Mervat's claim of excessive force is dismissed with prejudice.

### 4. Assault and Battery

Under New York law, a battery is an "intentional wrongful physical contact with another person without consent." *Lederman v. Adams*, 45 F. Supp. 2d 259, 268 (S.D.N.Y. 1999) (quoting

*Charkhy v. Altman*, 678 N.Y.S. 2d 40, 41 (App. Div. 1998)).  In the context of a police arrest, if the arrest is determined to be unlawful, "any use of force against a plaintiff may constitute a battery, regardless of whether the force is considered reasonable as applied during a lawful arrest." *Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 581 (S.D.N.Y. 2002) (citing cases).  Under New York law, an assault is "an intentional placing of another person in fear of imminent harmful or offensive contact."  *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001).  However, "where an arrest is supported by probable cause, an officer will not be liable under theories of assault and battery for the use of physical force when and to the extent she or he reasonably believes it is necessary to effect the arrest."  *Ladoucier v. City of N.Y.*, 2011 WL 2206735, at *6 (S.D.N.Y. June 6, 2011) (quotation and internal alterations omitted).

Here, given that probable cause existed to arrest both Plaintiffs[20], *supra*, their claims of assault and battery cannot be sustained, unless they can show that Defendant Ock used a degree or type of force to effect their arrests that he believed to be unreasonable at the time.  For the reasons previously discussed in the context of Plaintiffs' excessive force claims, the Court finds that Plaintiffs have not put forth sufficient evidence to raise a material factual dispute as to the reasonableness of the force that Ock used during Plaintiffs' arrests.[21]

Accordingly, Plaintiffs' claims for assault and battery are dismissed with prejudice.

---

[20] Although the Complaint contains no allegations suggesting assault or battery of Plaintiff Mohammed, the Court addresses this claim as to both Plaintiffs because the legal impediment is common to them both.

[21] Again, however, this analysis is entirely distinct from, and does not foreclose, the possibility that Plaintiff Mervat can establish a claim of unconstitutional conditions of pretrial detention based on her treatment by NYPD officers after her arrest.

### 5. Failure to Intervene

"[L]aw enforcement officials have an affirmative duty to intervene to protect against the infringement of constitutional rights from conduct committed by other officers in their presence." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001). A claim for failure to intervene is a derivative claim, in the sense that it must be predicated on another officer's actual violation of a plaintiff's rights. *See Briukhan v. City of N.Y.*, 147 F. Supp. 3d 56, 62 (E.D.N.Y. 2015) (citing *Wieder v. City of N.Y.*, 569 F. App'x 28, 30 (2d Cir. 2014)).

Although it is unclear which officers are the subject of Plaintiffs' failure to intervene claim, what is clear is that based on the Court having either dismissed or granted summary judgment on Plaintiffs' claims of false arrest and imprisonment, malicious prosecution, excessive force, assault, and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and *prima facie* tort, no officer can be found liable for failing to intervene with respect to those claims. The only claims that could still give rise to failure to intervene liability are Plaintiffs' claims based on free exercise, religious discrimination, and pre-trial conditions of confinement (should Plaintiff Mervat add the latter claim). Again, though, the non-intervening officers have yet to be identified. Furthermore, it is important for Plaintiffs to keep in mind that Defendant Ock, who is the only officer named in this matter thus far, *cannot* be held liable for failing to intervene with respect to conduct in which he is alleged to have participated directly. *See*, *e.g.*, *Clay v. Cnty. of Clinton*, 2012 WL 4485952, at *14 (N.D.N.Y. Sep. 27, 2012) (granting motion for judgment on the pleadings as it relates to plaintiff's failure to intervene claim because the plaintiff "fail[ed] to distinguish which . . . Defendant was responsible for actually violating Plaintiff's constitutional rights and which, if any, Defendant failed to intervene to prevent such violations from occurring").

Accordingly, Defendants' motion for summary judgment is granted on Plaintiffs' claim for failure to intervene to the extent that this claim is based on any of the dismissed claims.

## V. <u>Injunctive Relief</u>

Having ruled that Plaintiff Mervat's claims under the New York and U.S. Constitutions may proceed against the City, the Court will address the City's argument that Mervat lacks standing to seek injunctive relief in this action. (Defs.' Br. 14-15.) To establish standing for injunctive relief, a plaintiff must allege a likelihood that the unlawful conduct on which her claims are based will occur again in the future. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). The plaintiff must allege a threat of future injury that is "both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Shain v. Ellison*, 356 F. 3d 211, 215 (2d Cir. 2004) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).

Mervat concedes that her claim for injunctive relief is subject to these limitations (Pls.' Br. 18-20), but argues that she has pleaded a likelihood of encountering the same unlawful conduct because she and Mohammed "are in constant and consistent communication with Police Officers of the 104 precinct as a result of the ongoing disputes between themselves and their neighbors." (Pls.' Br. 19.) Defendants counter that Mervat "do[es] not allege . . . that Mervat has ever been arrested again or is likely to be in the future." (Defs.' Reply Br. 5.)

The Court agrees with Defendants. Even viewing the pleadings in the light most favorable to Mervat, she has failed to allege any facts suggesting a likelihood that she will be arrested again in the future and subjected to the same policy of having to remove her headscarf in the presence of male police officers during arrest processing. Although Mervat alleges "constant and consistent communication with" the NYPD, she does not offer any concrete reason to expect that she will be arrested again in the future. (Pls.' Br. 19.) Moreover, Mervat concedes that, two months after she

was arrested, the NYPD promulgated Interim Order 29, which established new protocols that permit arrestees to be photographed outside the presence of officers of the opposite sex due to their religious beliefs. (PCS, Ex. DD, at 1.) This change in NYPD policy further underscores Mervat's failure to plausibly allege that she will be the victim of the same unlawful conduct on which her religious discrimination claims are based.

For these reasons, the Court holds that Plaintiff Mervat does not have standing to pursue injunctive relief in this case. *See Lyons*, 461 U.S. at 105; *Shain*, 356 F.3d at 215.

## VI. Conclusion

For the foregoing reasons, the Court grants Defendants' motion in part and denies it in part. The parties shall submit a proposed joint scheduling order no later than April 14, 2017.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 31, 2017
      Brooklyn, New York